# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    v.

[1] JORGE BALBUENA-PEGUERO,
[2] LUCIANO GARCIA-MENDOZA,

    Defendants.

Criminal No. 16-656 (ADC)

## OPINION AND ORDER

### I.    Introduction and procedural history

By an Indictment, dated October 19, 2016, a federal grand jury charged defendants Jorge Balbuena-Peguero ("Balbuena") and Luciano García-Mendoza ("García") with one count each of conspiracy to import cocaine, 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(B), 963; conspiracy to possess cocaine with intent to distribute on a vessel without nationality, 46 U.S.C. §§ 70503(a)(1), 70506(b); and possession of cocaine with intent to distribute on a vessel without nationality, 46 U.S.C. § 70503(a)(1) and 18 U.S.C. § 2. **ECF No. 10** (Indictment). These charges stem from the approximately fifty-six kilograms of cocaine that defendants allegedly jettisoned from their boat when federal agents moved to intercept them in international waters about sixty-one miles from Puerto Rico. **ECF No. 1-1** (Customs Agent's Affidavit), ¶¶ 6, 9, 11. Defendants' vessel "did not display any indicia of nationality," and defendants were unable to sustain any oral claims about the vessel's nationality. *Id*., ¶ 8; *see also* **ECF No. 25** (defendants' stipulation of facts).

On March 30, 2017, Balbuena timely filed a motion, pursuant to Federal Rule of Criminal Procedure 12(b)(1), to dismiss the conspiracy and possession counts brought under 46 U.S.C. § 70503(a)(1), a provision of the Maritime Drug Law Enforcement Act ("MDLEA"). **ECF No. 25**. In essence, Balbuena argues that the MDLEA counts must be dismissed under the United States Constitution and international law because the MDLEA lies beyond the prescriptive jurisdiction of Congress. *See id.* Later that day, García adopted the motion in full and moved to dismiss the MDLEA counts as well. **ECF No. 26**. On April 10, 2017, the Government timely responded in opposition to the motion. **ECF No. 35**. The Court now denies the motion.

In the motion, defendants contend that, among other things, "enforcement of the MDLEA exceeds the limits of [the United States' jurisdiction under] international law, **ECF No. 25** at 3; Congress cannot have enacted the MDLEA pursuant to the Offenses Clause, U.S. Const. art. I, § 8, cl. 10, because the Clause only authorizes Congress to define and punish conduct constituting an offense under customary international law, *id*. at 8-10; and "the MDLEA's definition of 'vessel without nationality' extends far beyond what international custom or convention recognizes as statelessness," *id*. at 11. Each of those contentions lacks merits, thereby dooming the motion.

## II.    Legal standards under the Maritime Drug Law Enforcement Act ("MDLEA")

"The MDLEA makes it unlawful for an individual to 'knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance on board . . . a vessel of the United States or a vessel subject to the jurisdiction of the United States." *United States* v. *Nueci-Peña*, 711 F.3d 191, 197 (1st Cir. 2013) (ellipsis in original)

(quoting 46 U.S.C. §70503(a)(1)). "That prohibition 'applies even though the act is committed outside the territorial jurisdiction of the United States.'" *Id*. (quoting 46 U.S.C. § 70503(b)). "A vessel 'subject to the jurisdiction of the United States' includes 'a vessel without nationality.'" *Id*. (quoting 46 U.S.C. § 70502(c)(1)(A)). "'A vessel without nationality' in turn is defined, as relevant here, as 'a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.'" *Id*. (quoting 46 U.S.C. § 70502(d)(1)(C)).

### A.    The MDLEA definition of "vessel without nationality"

The First Circuit Court of Appeals has held that the MDLEA definition of 'vessel without nationality' "does not conflict with international law." *United States* v. *Matos-Luchi*, 637 F.3d 1, 6 (1st Cir. 2010). In fact, the MDLEA definition is "consistent with" the definition of a "stateless vessel" under international law. *Id*. at 6-7. Both definitions are "designed prudentially" and "informed by the need for effective enforcement." *Id*. at 6. Under both, "a vessel may be deemed 'stateless,' and subject to the enforcement jurisdiction of any nation on the scene, if it fails to display or carry insignia of nationality and seeks to avoid national identification." *Id*. Both the statute and international law allow a boat to "make an oral claim of nationality," but the boat "'must . . . be in a position to provide evidence of it'" because, to be valid, an "affirmative" claim of nationality must be "sustainable." *Id*. (quoting Anderson, *Jurisdiction over Stateless Vessels on the High Seas: An Appraisal under Domestic and International Law*, 13 J. Mar. L. & Com. 323, 341 (1982)). Thus, under the MDLEA and international law, a boat is "without nationality" if it does

not "fly a flag or carry registry papers," and if its oral "claim of nationality is . . . rejected or not

backed up by the nation invoked." *Id*. (citing 46 U.S.C. § 70502(d)(1)(A), (C)); *see also United*

*States* v. *Victoria*, 876 F.2d 1009, 1010 (1st Cir. 1989) (holding that a boat, sixty miles off the coast

of Colombia, that "had no flag or any other indications of nationality" was "a 'stateless' vessel"

under the MDLEA and international law because it had "no evidence of its nationality on

board.").[1]

### B.    Legality of United States jurisdiction over "vessels without nationality"

Once a vessel is deemed 'stateless,' the United States may "exercise criminal jurisdiction"

over it "pursuant to the Law of Nations and [the MDLEA]." *United States* v. *Cuevas-Esquivel*, 905

F.2d 510, 514 (1st Cir. 1990); *see also Victoria*, 876 F.2d at 1010 (holding that "the United States, as

a matter of international law, may prosecute drug offenders on stateless ships found on the high

seas" because "international law . . . gives the 'United States . . . authority to treat stateless vessels

as if they were its own.'") (final ellipsis in original) (quoting *United States* v. *Smith*, 680 F.2d 255,

258 (1st Cir. 1982)).  Indeed, "international law permits any nation to subject stateless vessels on

the high seas to its jurisdiction . . . *solely* as a consequence of the vessel's status as stateless"

because "a ship without a nationality, or unwilling to claim one, has no right of navigation by

international law." *Victoria*, 876 F.2d at 1011 (ellipsis and emphasis in original) (quoting *United*

---

[1] When *United States* v. *Victoria*, 876 F.2d 1009 (1st Cir. 1989) was decided, the MDLEA was codified in a different section of Title 46 and had not yet been moved to its current section.  *United States* v. *Matos-Luchi*, 627 F.3d 1, 3 (1st Cir. 2010) (recounting that the MDLEA was "initially enacted in 1986 as 46 U.S.C. app. § 1903, and later relocated to its present code sections, 46 U.S.C. §§ 70501-70507.") (internal citations omitted).

*States* v. *Marino-García*, 679 F.2d 1373, 1382-83 (11th Cir. 1982); then quoting Shearer, *Problems of Jurisdiction and Law Enforcement against Delinquent Vessels*, 35 Int'l & Comp. L. Q. 320, 336 (1986)). "Vessels without nationality are international pariahs" because they "are frequently not subject to the laws of a flag-state." *Marino-García*, 679 F.2d at 1382. "As such, they represent 'floating sanctuaries from authority' and constitute a potential threat to the order and stability of navigation on the high seas." *Id*. (citing H. Meyers, The Nationality of Ships 318 (1967); then citing M. McDougal & W. Burke, The Public Order of the Oceans 1084 (1962)).

For those reasons, "the assertion of jurisdiction over stateless vessels on the high seas in no way transgresses recognized principles of international law . . . nor results in impermissible interference with another sovereign nation's affairs." *Id*. at 1382-83. Also, "there need not be proof of a nexus between the stateless vessel and the country seeking to effectuate jurisdiction" because "[j]urisdiction exists solely as a consequence of the vessel's status as stateless." *Id*. at 1383. "Such status makes the vessel subject to action by all nations proscribing certain activities aboard stateless vessels and subjects those persons aboard to prosecution for violating the proscriptions." *Id*.; *see also Victoria*, 876 F.2d at 1011 (the First Circuit Court of Appeals declaring that it "agree[s] with" the "reasoning" of *Marino-García*).

Because any nation may exercise criminal jurisdiction over stateless vessels pursuant to international law, it is unremarkable that "[t]he MDLEA does not require a nexus between a defendant's conduct and the United States." *See Nueci-Peña*, 711 F.3d at 197 (citing 46 U.S.C. § 70502(c)). Similarly, the Define and Punish Clause, which is the constitutional provision under

which Congress enacted the MDLEA, "does not explicitly require a nexus between the unlawful

conduct [prohibited] and the United States be established before Congress can punish that

conduct." *Id*. at 198 (citing U.S. Const. art. I, § 8, cl. 10); *see also Smith*, 680 F.2d at 257 ("Congress

exercises jurisdiction over offenses committed beyond the territorial boundaries of the United

States pursuant to Article I, Section 8, Clause 10 of the Constitution, which authorizes Congress

'to define and punish Piracies and Felonies committed on the high Seas, and offences against

the Law of Nations.'"); **ECF No. 25** at 2, 5 (defendants acknowledging that Congress enacted the

MDLEA pursuant to the Define and Punish Clause).

### III.    Discussion of the legality of the MDLEA as applied to Defendants

#### A.    MDLEA prosecution of Defendants is consistent with International Law

Based on the case law above, the Court finds that the MDLEA, as applied to defendants,

conforms with international law.  As defendants stipulate for purposes of their motion, federal

agents apprehended them "in international waters between the Dominican Republic and Puerto

Rico heading . . . toward Puerto Rico." **ECF No. 25** at 1-2.  Their boat "did not display any indicia

of nationality," and "the appropriate authorities in the Dominican Republic . . . could neither

confirm nor deny" their oral claim about the boat's Dominican nationality.  *Id*. at 2.[2]  Based on

---

2 It appears that defendants' oral claim was equivocal.  The record indicates that defendants "provided conflicting statements as to the vessel's country of origin."  **ECF No. 1-1**, ¶ 8.  Their oral claims about the boat's nationality allegedly switched between the Dominican Republic and Puerto Rico.  *Id*.  If the boat was registered in Puerto Rico, the legality of applying the MDLEA to defendants is unassailable.  Vessels registered in Puerto Rico are vessels of the United States.  *United States* v. *Downs-Moses*, 329 F.3d 253, 258, 262 (1st Cir. 2003).  And, it is well-established law, pursuant to the "law of the flag" theory, "that a ship is constructively a floating part of the flag-state, that it is deemed to be part of the territory whose flag it flies and that the state has jurisdiction over offenses committed aboard the ship."  *United States* v. *Hayes*, 653 F.2d 8, 15 (1st Cir. 1981) (citing *Lauritzen*

those facts, the Court finds that the federal agents properly determined that defendants' vessel

was "without nationality pursuant to 46 U.S.C. § 70502(d)." *Id*.; *see also Matos-Luchi*, 637 F.3d at

6; *Victoria*, 876 F.2d at 1010. And, because defendants were on a stateless vessel in international

waters, their prosecution under the MDLEA complies fully with international law. *Victoria*, 876

F.2d at 1010-11; *see also Marino-García*, 679 F.2d at 1382-83. Accordingly, the Court hereby rejects

defendants' claim that their prosecution contravenes international law. *See* **ECF No. 25** at 3.

B.      **International Law does not independently constrain the powers of Congress**

In any event, the Court finds that international law does not independently restrict the

power of Congress to legislate pursuant to the Constitution. Principles of international law do

not constrain the constitutional powers of Congress unless the principles have been "accept[ed]"

and, thus, are self-imposed "by the United States." *Lauritzen* v. *Larsen*, 345 U.S. 571, 578 (1953)

(quoting *Farrell* v. *United States*, 336 U.S. 511, 517 (1949)). That is why the canon of construction

advising courts "that 'an act of congress ought never to be construed to violate the law of nations

if any other possible construction remains'" is just that – a presumption of legal interpretation –

and "not, as sometimes is implied, any impairment of our own sovereignty, or limitation of the

power of Congress." *Id*. (quoting *The Charming Betsy*, 6 U.S. 64, 118 (1804)); *see also United States*

v. *Ballestas*, 795 F.3d 138, 144 (D.C. Cir. 2015) (holding that "the so-called *Charming Betsy* canon

. . . 'represents a canon of construction, or a presumption about a statute's meaning, rather than

---

v. *Larsen*, 345 U.S. 571, 585 (1953)). Thus, "[i]t is clear that the 'law of the flag' theory gives Congress the power
to make possession of a controlled substance in an American vessel on the high seas a crime." *Id*.

a limit upon Congress's power to legislate.") (quoting *Morrison* v. *Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)). Thus, where "'a statute makes plain Congress's intent,'" as the MDLEA clearly does, "a court 'must enforce the intent of Congress irrespective of whether the statute conforms to . . . international law.'" *Ballestas*, 795 F.3d at 144 (quoting *United States* v. *Yousef*, 327 F.3d 56, 93 (2d Cir. 2003)) (upholding as constitutional application of the MDLEA to Colombian national charged with conspiracy to distribute cocaine based on ships seized in international or foreign-territorial waters). "After all, 'Congress is not bound by international law,' so 'it may legislate with respect to conduct outside the United States, in excess of the limits posed by international law.'" *Id.* (quoting *Yousef*, 327 F.3d at 86). Thus, although the Court has found that the MDLEA complies with international law, *see United States* v. *Bravo*, 489 F.3d 1, 7 (1st Cir. 2007), a finding to the contrary would not have threatened the validity of the statute for domestic purposes.

C.     **The MDLEA is constitutional pursuant to the Offences Clause**

In their motion, defendants also challenge the constitutionality of the MDLEA. As noted above, defendants recognize that "the MDLEA was enacted under Congress's power to 'define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations.'" **ECF No. 25** at 5 (quoting U.S. Const. art. I, § 8, cl. 10 ("Define and Punish Clause")); *see also Smith*, 680 F.2d at 257. The Define and Punish Clause empowers Congress to define and punish three separate categories of crime: 1) piracies, 2) felonies committed on the high seas, and 3) offenses against the law of nations. *United States* v. *Smith*, 18 U.S. 153, 158-59 (1820). The first two grants of power are known as the Piracies and Felonies Clause, whereas the third grant

of power is called the Offences Clause. *See*, *e.g.*, *United States* v. *Bellaizac-Hurtado*, 700 F.3d 1245, 1249, 1257 (11th Cir. 2012) (employing this terminology).

Defendants devote much of their motion to dismiss to arguing that Congress cannot have enacted the MDLEA pursuant to the Piracies and Felonies Clause. *See* **ECF No. 25** at 5-8. The Court express no opinion on the topic, however. It is a "settled rule" of judicial decision-making "to decide no more than is necessary to the case in hand." *Elgin Nat'l Watch Co.* v. *Illinois Watch Case Co.*, 179 U.S. 665, 670 (1901). And, it is pellucid that Congress properly enacted the MDLEA under the Offences Clause. *See* Sarah H. Cleveland & William S. Dodge, *Defining and Punishing Offenses Under Treaties*, 124 Yale L. J. 2202, 2273-75 (2015) (hereinafter, "Cleveland & Dodge").

### i. Introduction to the Offences Clause

In our federal system, "the Government of the United States has been vested exclusively with the power of representing the nation in all its intercourse with foreign countries." *United States* v. *Arjona*, 120 U.S. 479, 483 (1887). "It alone can 'regulate commerce with foreign nations,' [and] make treaties and appoint ambassadors and other public ministers and consuls." *Id*. (quoting U.S. Const. art. I, § 8, cl. 3; then citing U.S. Const. art. II, § 2, cl. 2). By contrast, "[a] state is expressly prohibited from entering into any 'treaty, alliance, or confederation.'" *Id*. (quoting U.S. Const. art. I, § 10, cl. 1). "Thus all official intercourse between a state and foreign nations is prevented, and exclusive authority for that purpose [is] given to the United States." *Id*. "The national government is in this way made responsible to foreign nations for all violations by the United States of their international obligations, and because of this, Congress is expressly

authorized 'to define and punish . . . offences against the law of nations.'" *Id*. (quoting U.S.

Const. art. I, § 8, cl. 10). Indeed, the Supreme Court has stated that the Offences Clause "attempts

to further" the United States' "vital national interest in complying with international law." *Boos*

v. *Barry*, 485 U.S. 312, 323 (1988). Accordingly, the Clause cannot be construed as doing less,

and has not been so construed by the Supreme Court. *See Arjona*, 120 U.S. at 488 (finding that

"if the thing made punishable is one which the United States are required by their international

obligations to use due diligence to prevent, it is an offence against the law of nations.")

### ii. Treaties are part of the "Law of Nations" for purposes of the Clause

As the case law above shows, "treaties" are one source of United States obligations under

international law. *Arjona*, 120 U.S. at 483; *see also* Restatement (Third) of Foreign Relations Law

§ 102(3) ("International agreements create law for the states parties thereto."). And, the Offences

Clause exists to help ensure that the United States complies with its treaty obligations, among

other things. *See Arjona*, 120 U.S. at 483; *Boos*, 485 U.S. at 323. The fact that the Clause empowers

Congress to "define and punish" criminal offenses pursuant to proper treaty obligations can be

gleaned from the plain language of its text. *See* U.S. Const. art. I, § 8, cl. 10; *see also Bond* v. *United*

*States*, 134 S. Ct. 2077, 2103-11 (2014) (Thomas, J., concurring) (indicating that the Treaty Power

is a federal power that is limited to matters of legitimate international intercourse); *United States*

v. *Angulo-Hernández*, 565 F.3d 2, 4 (1st Cir. 2009) (observing that Congress enacted the MDLEA

in response to "the 'serious international problem' of maritime drug smuggling") (quoting 46

U.S.C. § 70501).  After all, the Clause expressly provides that Congress may define and punish

criminal offenses that are contrary to the "Law of Nations."  *See* U.S. Const. art. I, § 8, cl. 10.

At the time of the Founding (as well as many decades before and after), the plain meaning

of the term "Law of Nations" included treaty obligations, which were also known at the time as

the "conventional law of nations."  *See Thirty Hogsheads of Sugar* v. *Boyle*, 13 U.S. 191, 198 (1815)

(per Marshall, C.J.) ("The law of nations . . . is in part unwritten, and in part conventional."); *The*

*Venus*, 12 U.S. 253, 283 (1814) (per Washington, J.) (equating the "conventional law of nations"

with "treaties"); *Ware* v. *Hylton*, 3 U.S. 199, 227 (1796) (per Chase, J.) ("The law of nations may

be considered of three kinds, to wit, general, conventional, or customary. . . . The second is

founded on express con[s]ent, and is not universal, and only binds those nations that have

assented to it."); *see also* Cleveland & Dodge, 124 Yale L. J. at 2212 ("The two authorities that the

founding generation consulted most frequently – Emmerich de Vattel's Law of Nations and

William Blackstone's Commentaries on the Laws of England – both used 'law of nations' in this

comprehensive sense" of including treaties within its scope.).  Indeed, citing an array of primary

sources, Professors Cleveland and Dodge persuasively show that "the general understanding

of the 'law of nations,' from at least the publication of Vattel's The Law of Nations in 1758 until

well into the nineteenth century, embraced all forms of international law, including treaties."

*Id*. at 2215-16.  Thus, the Court finds that the Offenses Clause empowers Congress to define and

punish criminal offenses that international obligations, including legitimate treaty obligations,

require the United States to use due diligence to prevent.  *See Arjona*, 120 U.S. at 488.

### iii.     The 1988 U.N. Convention against Illicit Traffic in Narcotic Drugs

The United States, as well as dozens of other nations, is party to the 1988 United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances ("U.N. Drug Convention"), Dec. 20, 1988, 1582 U.N.T.S. 95. Parties to the Convention jointly recognize that the "eradication of illicit traffic is a collective responsibility of all States and that, to that end, co-ordinated action within the framework of international co-operation is necessary." *Id*. They also declare their determination "to improve international co-operation in the suppression of illicit traffic by sea." *Id*. To that end, a Party is obligated "to establish as criminal offences under its domestic law, when committed intentionally . . . [t]he possession . . . of any narcotic drug or psychotropic substance for the purpose of [distribution]." *Id*., art. 3(1)(a)(iii). The Party not only "[s]hall . . . establish its jurisdiction over the offenses" when "committed on board a vessel flying its flag," but the Party "[m]ay . . . establish its jurisdiction over the offenses" when "committed on board a vessel concerning which that Party has been authorized to take appropriate action pursuant to article 17." *Id*., art. 4(1)(a)(ii), (b)(2). Meanwhile, Article 17 of the Convention allows Parties to take appropriate action against a boat "not displaying a flag or marks of registry [that] is engaged in illicit traffic." *Id*., art. 17(2). Article 17 also requires Parties to "co-operate to the fullest extent possible to suppress illicit traffic by sea, in conformity with the international law of the sea." *Id*., art. 17(2). As a Party to the treaty, these are obligations of the United States.

### iv.     The MDLEA defines and punishes offenses under the U.N. Convention

The Court finds that the MDLEA, as applied to defendants, constitutes a proper exercise

of Congress's express power to "define and punish . . . Offences against the Law of Nations."

*See* U.S. Const. art. I, § 8, cl. 10; *see also* Cleveland & Dodge, 124 Yale L. J. at 2273-75 (explaining

that the MDLEA is a constitutional enactment under the Offences Clause).  Pursuant to Articles

3, 4, and 17 of the U.N. Drug Convention, of which it is a Party, the United States has voluntarily

assumed international legal obligations to combat the illicit traffic of drugs on the high seas by,

among other things, "establish[ing] its jurisdiction over [drug] offenses" when "committed on

board a vessel" that is "not displaying a flag or marks of registry."  U.N. Drug Convention, arts.

4(1)(b)(2), 17(1).  One of the drug offenses that the U.N. Drug Convention requires Parties "to

establish as [a] criminal offence under its domestic law, when committed intentionally," is the

"possession . . . of any narcotic drug or psychotropic substance for the purpose of [distribution]."

*Id.*, art. 3(1)(a)(iii).  The MDLEA, by prohibiting the knowing or intentional possession of cocaine

with intent to distribute on board a vessel without nationality, properly defines and punishes

that U.N. Drug Convention offense.  *See* 46 U.S.C. §§ 70502(c)(1)(A), 70503(a)(1).  Accordingly,

the MDLEA is a constitutional enactment.  *See, e.g.*, *Arjona*, 120 U.S. at 488.

### v.     The correct definition of "Law of Nations" as used in the Offences Clause

Defendants' arguments to the contrary are meritless.  They claim that the MDLEA is not

a proper exercise of Congress's power under the Offenses Clause, but they base the claim on an

incorrect interpretation of the term "Law of Nations," as used in the Clause.  *See* **ECF No. 25** at

8-9. According to defendants, "Law of Nations" only "means customary international law" and, thus, excludes international treaty obligations from its scope. *Id*. (quoting *Bellaizac-Hurtado*, 700 F.3d at 1251). However, that narrowly circumscribed definition of "Law of Nations" comes from "decisions interpret[ing] the Alien Tort Statute, instead of the Offences Clause," and is founded upon the assumption that "the Framers understood the term 'the law of nations' in the Offences Clause and the Alien Tort Statute to mean the same thing." *Bellaizac-Hurtado*, 700 F.3d at 1251. As Professors Cleveland and Dodge make plain, that assumption is "dangerous" and mistaken. Cleveland & Dodge, 124 Yale L. J. at 2206. "The Framers of the Constitution clearly understood the law of nations to include treaties, or what they called 'the conventional law of nations.'" *Id*. As a result, "the most accurate modern translation of the 'law of nations' as used in the Offenses Clause into contemporary parlance is not 'customary international law' but rather 'international law,' which includes both customary international law and treaties." *Id*. at 2206-07.

"To be sure, members of the founding generation occasionally used 'law of nations' to refer to the unwritten law of nations [*i.e.*, customary international law] in contradistinction to treaties, when both terms were employed together." *Id*. at 2216. This secondary usage "seems to have been common when people referred to treaties expressly and needed a catch-all phrase to refer to the other categories of the law of nations." *Id*. "So they used the general phrase 'law of nations,' which would encompass both the 'customary' and the 'voluntary' law of nations,[3]

---

[3] According to Emmerich de Vattel, the "voluntary" law of nations was one of the four categories into which the law of nations could be divided. *See* Sarah H. Cleveland & William S. Dodge, *Defining and Punishing Offenses Under Treaties*, 124 Yale L. J. 2202, 2212 (2015). The three other categories were the "necessary," the

despite this phrase's redundancy with respect to the 'conventional' law of nations – that is,

treaties." *Id*. When the Alien Tort Statute, unlike the Offences Clause, "refers separately to both

'the law of nations [and] a treaty of the United States,'" *id*. (alteration in original) (quoting 1 Stat.

73, 76-77 (1789), codified at 28 U.S.C. § 1350), the statute is using "law of nations" in its secondary

sense. That is why courts, in "the context of the [Alien Tort Statute], . . . have consistently used

the term 'customary international law' as a synonym for the term the 'law of nations.'" *Flores* v.

*S. Peru Copper Corp.*, 414 F.3d 233, 237 n.2 (2d Cir. 2003). By contrast, "the general understanding

of the 'law of nations' at the Constitution's adoption," including as used in the Offences Clause,

"was that it included all international law – the 'voluntary,' the 'customary,' and the

'conventional,' which is to say treaties." Cleveland & Dodge, 124 Yale L. J. at 2217.[4]

---

"conventional," and the "customary." *Id*. The 'voluntary law of nations' was "based on natural law, but it created external rights and duties." *Id*. It was "not 'voluntary' in the modern sense of the word, for nations were obligated to consent to it." *Id*. "The 'necessary law of nations' was based directly on natural law." *Id*. "It was immutable and binding, but only internally upon the conscience of the sovereign." *Id*. Finally, the 'conventional law of nations' consisted of treaties, and the 'customary law of nations' was similar to "today's customary international law," except that "nations were free to withdraw from particular rules." *Id*.

[4] Professor Eugene Kontorovich has helped propagate the erroneous assumption that the term "law of nations" means the same thing in both the Alien Tort Statute and the Offences Clause. In his influential law-review article *Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction over Drug Crimes*, 93 Minn. L. Rev. 1191 (2009), he writes, in the context of the Offences Clause, that "[t]he 'Law of Nations' is generally understood as being the eighteenth- and nineteenth-century term for CIL," *i.e.*, customary international law. *Id*. at 1224 n.225. But the only authority he cites to support that broad assertion is the *Flores* decision above. *See id.* Although he quotes the sentence from *Flores* in the main text, Professor Kontorovich excludes, without any indication of having done so, the *Flores* Court's qualification that the Court is defining the "law of nations" in terms of "customary international law" only "[i]n the context of the [Alien Tort Statute]." *See id*.; *compare with Flores*, 414 F.3d at 237 n.2. In his forceful dissent in *United States* v. *Cardales-Luna*, 632 F.3d 731 (1st Cir. 2011), Judge Torruella quotes Professor Kontorovich's erroneous interpretation of "Law of Nations" and misleading quotation of *Flores* – and nothing else – to support the idea that the Offences Clause is limited to crimes under customary international law. *See id*. at 745 (Torruella, J., dissenting).

As Professors Cleveland and Dodge point out, there is "nothing particularly surprising"

about this secondary usage of "law of nations." *Id*. at 2216.  After all, the term "'[i]nternational

law' is sometimes used today in the same way to refer to customary international law in contrast

to treaties, despite the fact that 'international law' plainly includes both customary international

law and treaties." *Id*.; *see, e.g., Rasul* v. *Bush*, 542 U.S. 466, 472 (2004) ("They claimed that denial

of these rights violates the Constitution, international law, and treaties of the United States.");

*Braniff Airways, Inc.* v. *Nebraska State Bd. of Equalization & Assessment*, 347 U.S. 590, 594-95 (1954)

("The United States of America is declared to possess and exercise complete and exclusive

national sovereignty in the air space above . . . [the waters] over which by international law or

treaty or convention the United States exercises national jurisdiction.") (quoting former 49

U.S.C. § 176(a)); *United States* v. *Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936) ("operations

of the nation in [foreign] territory must be governed by treaties, international understandings

and compacts, and the principles of international law.").  Armed with this knowledge, courts

may no longer erroneously assume that the term's primary usage is the same as its secondary.

Finally, as explained above, Professors Cleveland and Dodge have ably documented that

"Law of Nations," as used in the Offences Clause, encompasses proper treaty obligations.  But

Supreme Court precedent also demonstrates that defendants' narrower construction of the term

is wrong.  Again, defendants, looking to the secondary meaning of the term as used in the Alien

Tort Statute, assert that "Law of Nations" means customary international law.  **ECF No. 25** at 9.

In particular, they view the term as covering only the "small subset of crimes 'recognized by the

community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, war crimes, and perhaps certain acts of terrorism.'" *Id*. (quoting Restatement (Third) of Foreign Relations Law, § 404). However, in *United States* v. *Arjona*, 120 U.S. 479 (1887), the Supreme Court unanimously construed the term "offence against the law of nations," as used in the Clause, as reaching any criminal conduct "which the United States are required by their international obligations to use due diligence to prevent." *Id*. at 488. Moreover, in *Arjona*, the Supreme Court deployed the Offences Clause not to uphold one of defendants' small subset of crimes, but to uphold Congress's enactment of a law "to prevent and punish the counterfeiting within the United States of notes, bonds, and other securities of foreign Governments." *Id*. at 480 (quoting 23 Stat. 22 (1884)). And, the Court did so based on the international-law principle, drawn from Vattel's Law of Nations, "that if one nation counterfeits the money of another, or if she allows and protects false coiners who presume to do it, she does that nation an injury." *Id*. at 484. Clearly, the Supreme Court was not using the narrower conception of the term "Law of Nations" that defendants suggest, but the broader conception that this Court has affirmed.

Because defendants' arguments against Congress's ability to enact the MDLEA under the Offences Clause are based upon the erroneous assumption that the Clause can only reach crimes under customary international law, *see* **ECF No. 25** at 10, the Court now rejects them.

**D.** **The MDLEA definition of "vessel without nationality" comports with the International Law definition of "stateless vessel"**

Defendants' last claim against the MDLEA states that "the MDLEA's definition of 'vessel without nationality' extends far beyond what international custom or convention recognizes as statelessness." *Id*. at 11. However, as explained above, the law of this Circuit holds otherwise. *See Matos-Luchi*, 637 F.3d at 6-7. Accordingly, the Court detects no reason to dismiss the MDLEA counts from the Indictment. The MDLEA, as applied to defendants, is perfectly valid.

## IV. Conclusion

In sum, the Court hereby **DENIES** defendants' motion to dismiss. *See* **ECF Nos. 25, 26**.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 18th day of April, 2017.

**S/AIDA M. DELGADO-COLÓN**
**Chief United States District Judge**